UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

Moses: Nelson,

Plaintiff,

*Standing in propria persona, Sui*

juris

-against-

COUNTRYWIDE HOME LOANS, INC; BANK
OF AMERICA, N.A. AS SUCCESSOR TO
BAC HOME LOAN SERVICING, LP;
AMERICAN BROKERS CONDUIT; U.S.
BANK, NATIONAL ASSOCIATION AS
TRUSTEE FOR THE BANK OF AMERICA
FUNDING 2007-1 TRUST; WELLS FARGO
BANK, N.A., AS THEIR ATTORNEY IN FACT;
MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC. (MERS); and JOHN "DOES"
and JANE "ROES", 1 through 100.

Defendant(s).

Case No. 3:18-cv- 2081 (SRU)

2018 DEC 19 ᵽ 1: 30

US DISTRICT COURT
DISTRICT OF CT

**VERIFIED CIVIL R.I.C.O. COMPLAINT
PURSUANT TO 18 U.S.C. § 1964(c)**

JURY TRIAL DEMANDED

DECEMBER 17, 2018

PRELIMINARY STATEMENT

COMES NOW the Plaintiff, Moses Nelson, to sue for equitable relief from

damages that the Defendant(s), and each of them, have perpetrated upon Plaintiff

through an unlawful fraudulent interstate enterprise. The Plaintiff hereby sues the

Defendant(s), and each of them, based upon personal firsthand knowledge which has

recently come to Plaintiff's attention through his own due diligent research, as to

Defendant's own conduct, and upon the basis of newly discovered information and

belief as to all other matters. Plaintiff's information and belief is based, among other

things, on documents generated by or on behalf of the Defendant(s), and each of them,

which reveal the Defendant(s), and each of them, having knowing participation in the

fraudulent scheme detailed in this action.

Plaintiff has incontrovertible proof that the Defendant(s) have benefitted from the fraudulently appraised Value of the subject properties listed within this Complaint. All Defendant(s) are liable for the fraud and are responsible for their participation as beneficiaries of the Mortgage industry's pattern and practices of doing business as a corrupt influenced racketeering enterprise. The whole American economy has been a victimized by the Banks and Mortgage lenders from this massive egregious financial scheme, and Plaintiff has been personally damaged as a result, and respectfully seeks redress of his grievance in this Court for an equitable remedy of violations of 18 U.S.C. § § 1964(c), Connecticut General Statutes (CGS) § 53-379a(b)(1)(2), and the united States Constitution.

## JURISDICTION AND VENUE

i.  There are several sources of subject matter jurisdiction in this Court:

   a) 28 U.S.C. §§ 1331 & 1332, for Federal Question and Diversity of Citizenship;

   b) 28 U.S.C. § 1337, for Regulation of Commerce, Trade and Amount in Controversy;

   c) 28 U.S.C. § 1367, for Supplemental Jurisdiction over claims arising within state jurisdiction that are so related to claims in the action within such original jurisdiction that they form a part of the same case or controversy under Article III of the united States Constitution;

ii.  a) 28 U.S.C. § 1391, for Venue Generally where a substantial part of the events or omissions giving rise to this action occurred in this District;

   b) This Court also has Venue jurisdiction over the Mortgage fraud

conducted in connection to the subject property(s) located in Fairfield County;

iii.    a)   This Court also has original jurisdiction to hear Plaintiff's claim under 18 U.S.C. § 1964(c), for Civil R.I.C.O. violations of law and treble damages in accordance with the decision rendered in the united States Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455 (1990).

        b)   Connecticut General Statutes (CGS) § 53-379a(b)(1)(2) and § 36a-485, for Supplemental Jurisdiction under 28 U.S.C. § 1367.

---

**TO THE HONORABLE COURT**:

Plaintiff, Moses Nelson, an unincorporated living soul, and natural man on the land, who is neither an enemy of the state, or friend of an enemy of the state, Standing before the Court *in propria sui juris*, claiming and declaring the exercise of all unalienable constitutional Rights, respectfully verifiably states, alleges facts giving rise to causes of action covered under the Constitutions of the united States and Connecticut State Republic and provisions of statutory federal law to seek equitable remedy for the following damages:

I.    <u>NATURE OF THE ACTION</u>

1. This is an action for triple damages, costs and attorney fees under 18 U.S.C. § 1964(c) of the Federal Racketeer Influenced and Corrupt Organizations Act (R.I.C.O.), 18 U.S.C. §§ 1961-1968, *et. seq.*, arising out of an ongoing pattern of Mortgage Fraud being conducted by the Defendant(s), and each of them, and other unknown non-party malfeasants in violation of 18 U.S.C. § 1962(c).

## II.   PARTIES

A. Plaintiff, Moses Nelson, is a proper Party American Citizen, who receives mail at 1584 North Avenue, Bridgeport, Connecticut State Republic [06604] Non-Domestic.

B. Defendant COUNTRYWIDE HOME LOANS, INC. hereinafter "Original Lender 1", is a proper Party to this action who was a Mortgage Lender at the time of the financial crisis of 2008 and is currently out of business. Defendant Original Lender 1 purportedly assigned their interests in Plaintiff's Mortgage to Defendant BAC HOME LOAN SERVICING through its "nominee", Defendant MERS. Defendant Original Lender 2's former business location was 13150 World Gate Drive, Herndon, Virginia 20170.

C. Defendant BANK OF AMERICA, N.A., hereinafter "BOA" is a proper Party to this action doing business under the laws of the united States of America, whose principle place of business is 100 North Tryon Street, Charlotte, N.C. 28255.

D. Defendant BAC HOME LOAN SERVICING, LP, hereinafter "BAC", is a proper Party to this action doing business under the laws of the united States of America, whose principle place of business is 101 South Tryon Street, Charlotte, N.C. 28255.

E. Defendant AMERICAN BROKERS CONDUIT, hereinafter "Original Lender 2", is a proper Party to this action who was a Mortgage Lender at the time of the financial crisis of 2008 and is currently out of business. Defendant Original Lender 1 purportedly assigned their interests in Plaintiff's

Mortgage to Defendant U.S. BANK through its "nominee", Defendant

MERS. Defendant Original Lender 1's former business location was 538

Broad Hollow Road, Melville, Long Island 11747.

F. Defendant U.S. BANK, NATIONAL ASSOCIATION AS TRUSTEE FOR

THE BANK OF AMERICA FUNDING 2007-1 TRUST, hereinafter "U.S.

BANK", is a proper Party to this action doing business under the laws of

the united States of America, whose principle place of business is 425

Walnut Street, Cincinnati, Ohio 45202

G. Defendant WELLS FARGO BANK, N.A., hereinafter "WFB", is a proper

Party to this action doing business under the laws of the united States of

America, whose principle place of business is 420 Montgomery Street,

San Francisco, CA 94104.

H. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,

INC., hereinafter "MERS", is a proper Party to this action doing business

under the laws of the united States of America, whose principle place of

business is 1818 Liberty Street, Suite 300, Reston, Virginia 20190.

I. Defendant(s) JOHN "DOES" and JANE "ROES" 1 through 100 are proper

Party(s) to the Complaint, but unknown, and Plaintiff reserves the right to

join these Party(s) once they have been identified.

### III.   THE R.I.C.O. PERSON

2. Defendant(s), and each of them, are the Successor(s), or Agent(s) in interest to

the Party(s) identified as the "Original Lender(s)" for the Mortgage(s) and

Promissory Note(s) dated January 28, 2005 (*See* Exhibit "1", Plaintiff's Mortgage

and Promissory Note with Defendant "Original Lender 1"), and October 18, 2006 (and, *See also* Exhibit "2", Plaintiff's Mortgage and Promissory Note with Defendant "Original Lender 2").

3. Defendant(s), and each of them, have assumed legal rights, duties and liabilities that run with the Promissory Note.

4. Defendant(s), and each of them, fraudulently misrepresented the Value of the subject property(s) and misrepresented the Loan to Fair Market Value Ratio based upon a false and inflated appraisal overstating the property value, conducted as part of a pattern of racketeering activity by the non-party malfeasants. (*See* Exhibit "3", General Data Real Estate Appraisal for the City of Bridgeport for Plaintiff's subject property located at 757-759 Iranistan Avenue, and Exhibit "4" 1584 North Avenue for Plaintiff's subject property located at dated for the years 2005 & 2006 respectively).

## IV.   STATEMENT REGARDING LOAN DEFINITIONS

5. Within the Mortgage Lending Industry, the term "Prime" Loan means a safe Mortgage Loan to a Borrower who is regarding as being highly creditworthy, has no obvious financial difficulties and a good payment record, and is therefore very likely to repay the loan. Fannie Mae, which is the largest secondary market buyer of Mortgage Loans, established the "Prime" standard for Loan underwriting. "Subprime" Loan (also referred to as Near-Prime, Non-Prime, and second-chance lending) means a Mortgage Loan to a Borrower who may have difficulty maintaining the repayment schedule. "Alt-A" (short for Alternative A-paper) means a type of Mortgage Loan that is considered riskier that A-paper, or

"Prime", and less risky than "Subprime". Typically Subprime and Alt-A Mortgages are characterized by Borrowers with less than full documentation, lower Credit Scores, higher Loan to Fair Market Value Ratios, and more investment properties. A "Predatory" Loan is one that is lent based on the Borrower's alleged equity in the property, not on the Borrower's ability to repay the Loan, when in fact, the Borrower's equity is fictional and based on an inflated appraisal overstating the property value. A "Liar's Loan" is a type of predatory Loan.

6. "Alt-A Loans. Another type of common Loan during the years leading up to the financial crisis was the "Alt-A" Loan. Alt-A Loans were issued to Borrowers with relatively good Credit histories, but with aggressive underwriting that increased the risk of the Loan. The resulting high Loan-to-Value Ratio, and the lack of Borrower equity in the home, meant that, if the Borrower defaulted and the home had to be sold, the sale proceeds were unlikely to be sufficient to repay both Loans. For example, Alt-A Loans often allowed Borrowers to obtain 100% financing of their homes, to have an unusually high debt to income ratio, or submit limited or even no documentation to establish their income levels. Alt-A Loans were sometimes referred to as "Low Doc" or "No Doc" Loans. They were originally developed for self-employed individuals who could not easily establish their income by producing a traditional W-2 Tax Return Form or pay stubs, and so were allowed to submit "alternative" documentation to establish their income or assets, such as bank statements. The reasoning was that other underwriting criteria could be used to ensure that Alt-A Loans would be repaid, such as selecting only Borrowers with a high Credit score or with a property appraisal

showing the home had substantial Value in excess of the Loan amount. (*See*

"WALL STREET AND THE FINANCIAL CRISIS: *Anatomy of a Financial*

*Collapse*"*,* United States Senate Staff Report, April 13, 2011, pages 23-24; and

"Evaluation of Federal Regulatory Oversight of Washington Mutual Bank",

prepared by the Offices of the Inspector General at the Department of the

Treasury and Federal Deposit Insurance Corporation, 4/2010).

V.     THE R.I.C.O. ENTERPRISE

7.  The "Liar's Loan Enterprise" consists of the hundreds of entities making up the

national Subprime Mortgage Industry, whose top executives operated these

companies as control frauds (a financial weapon against society) by rigging

financial incentives within the industry to reward a nationwide pattern of

brokering, originating, bundling as Securities, selling into the Secondary Market,

Servicing, and foreclosing on what the industry insiders dubbed as "Liar's Loans",

which are stated income Mortgage Loans mad with no income verification, little

or no documentation, no underwriting, a false and inflated appraisal overstating

the Value of the property, and an understated Loan-to-Fair Market-Value-Ratio.

The Liar's Loan Enterprise is a subject of Public Interest of the national Mortgage

Lending Industry. (*See* "Public Policy Issues Raised by the Report of the Lehman

Bankruptcy Examiner: *Hearing before the Committee on Financial Services*,

United States House of Representatives", statement of William K. Black, April 20,

2010; "*Testimony Before the Financial Crisis Commission*", Miami Florida,

statement of William K. Black, Associate Professor of Economics and Law,

September 21, 2010; "*Neo-classical Economic Theories, Methodology and*

*Praxis Optimize Criminogenic Environments and Produce Recurrent, Intensifying Crises*", Creighton Law Review, 2010; and "*Lenders Put the Lie's in Liar's Loans and Bear the Principal Moral Culpability*", New Economic Perspectives, October 2011).

8. The Non-Party malfeasants consist of:

   a) the top Subprime Mortgage Originators;

   b) the top Subprime Mortgage-Backed Securities Issuers;

   c) the top Subprime Mortgage Servicers; the national appraisal management companies;

   d) the nationwide network of Subprime Mortgage Brokers;

   e) certain Non-Agency and Agency Institutional Investors; and

   f) the Federal Reserve Bank Chairmen, Alan Greenspan and Ben Bernanke; who all played a significant role in the creation of millions of Liar's Loans originated nationwide between the years 2001 and 2008.

9. The top Subprime Mortgage Originators include, but are not limited to:

   a) HSBC,

   b) NEW CENTURY FINANCIAL,

   c) COUNTRYWIDE,

   d) CITIGROUP,

   e) BANK OF AMERICA

   f) WMC MORTGAGE,

   g) FREMONT,

   h) AMERIQUEST MORTGAGE,

i) OPTION ONE,

j) WELLS FARGO,

k) FIRST FRANKLIN,

l) LaSALLE BANK,

m) JP MORGAN CHASE,

n) DITECH,

o) AMERICAN BROKERS CONDUIT,

p) GMAC,

q) M&T BANK, *etc.* (*See* "*UNDERSTANDING THE SECURITIZATION OF SUBPRIME MORTGAGE CREDIT*", Federal Reserve Bank of New York, 2007).

10. The top Subprime Mortgage-Backed Securities Issuers include, but are not limited to:

a) COUNTRYWIDE,

b) NEW CENTURY,

c) OPTION ONE,

d) FREMONT,

e) WASHINGTON MUTUAL,

f) FIRST FRANKLIN,

g) RESIDENTIAL FUNDING CORP.,

h) LEHMAN BROTHERS,

i) WMC MORTGAGE,

j) AMERIQUEST, *etc.*

11. The top Subprime Mortgage Servicers include, but are not limited to:

   a) COUNTRYWIDE,

   b) JP MORGAN CHASE,

   c) CITIGROUP,

   d) OPTION ONE,

   e) AMERIQUEST,

   f) OCWEN FINANCIAL CORP.,

   g) WELLS FARGO,

   h) HOMECOMINGS FINANCIAL,

   i) HSBC,

   j) LITTON LOAN SERVICING,

   k) SPECIALIZED LOAN SERVICING,

   l) CARRINGTON LOAN SERVICING,

   m) AURORA LOAN SERVICES, *etc.*

12. The national appraisal management companies include, but are not limited to:

   a) LANDSAFE (owned by BANK OF AMERICA/COUNTRYWIDE),

   b) FINITI (owned by CITIGROUP and FIRST AMERICAN REAL ESTATE

   (FARES)),

   c) RELS (owned by WELLS FARGO and FARES),

   d) eAppraiseIT (owned by JP MORGAN CHASE/WASHINGTON MUTUAL and

   FARES),

   e) Quantrix (owned by JP MORGAN CHASE),

f) LENDERS SERVICES (LSI) (owned by JP MORGAN CHASE/WASHINGTON

MUTUAL, FIDELITY, LSI SERVICE LINK, CHICAGO TITLE, LAWYERS TITLE,

COMMONWEALTH TITLE and LAND AMERICA),

g) VELOCITY, FISERVE, and AMCO (Valuation Services, LLC), *etc.* (*See*

"*HVCC Mandates Decreased Market Competition and Increased Pricing*,

(diagram), http://tampaappraisalmanagement.com/wp-

content/uploads/2010/0803-AMC-Joint-Venture-Diagram-FINAL.pdf).

13. The top Non-Agency and Agency Mortgage-Backed Securities Investors include,

but are not limited to:

    a)  COUNTRYWIDE;

    b)  LEHMAN BROTHERS;

    c)  WELLS FARGO;

    d)  WASHINGTON MUTUAL;

    e)  BEAR STEARNS;

    f)  JP MORGAN CHASE;

    g)  DEUTSCHE BANK;

    h)  GMAC-RFC

    i)  MERRILL LYNCH;

    j)  MORGAN STANLEY;

    k)  CREDIT SUISSE;

    l)  FEDERAL NATIONAL MORTGAGE ASSOCIATION (FNMA);

    m) FEDERAL HOME LOAN MORTGAGE CORPORATION (FHLMC);

    n)  GOVERNMENT NATIONAL MORTGAGE ASSOCIATION (GNMA).

14. Between the years 1997 and 2010, large national consumer lending institutions and their network of Mortgage Brokers who were involved in Subprime and Alt-A lending engaged in an unscrupulous pattern of making shoddy Mortgage Loans with inflated appraisals. The most pernicious variety of these Subprime and Alt-A Loans were what Industry Insiders dubbed "Liar's Loans". The most salient features of a Liar's Loan are no income verification, no documentation, no consideration of the Borrower's ability to repay, and a false and inflated appraisal.

15. This new paradigm within the Mortgage Industry of making intentionally bad Loans for profit was born out of the so-called "Securitization" of Consumer Debt. (*See* "*Securitized Total Consumer Loans*", Board of Governors of the Federal Reserve System, graph - http://research.stlouisfed.org.fred2/series/TOTALSEC. The graph shows a steady rise in Securitization of Consumer Loans on a nationwide basis beginning about 1990, and a hard climb starting in about 1995, reaching a peak in about 2008 before taking a near vertical dive at the end of 2009).

16. The process of Securitization involved the pooling together of Mortgage Loans by the hundreds for quick profits. Instead of having to wait around for homeowners to make their Mortgage payments month-by-month, year-by-year, Lenders could immediately turn the Loans into cash by selling the Loans for use in Securities deals. The rapid turnaround allowed Lenders without much Capital of their own to make more Loans and dramatically increase their volume of Lending. Before Securitization, Lenders had either held on to their Loans,

collecting payments until the homeowners owned their houses free and clear, or sold them one by one or in groups on the "Secondary Market" to Investors, who took over the right to collect on the Loans. This tended to limit the ability of Lenders to increase their Loan Volume. They either had to entice Customer to deposit savings in the Bank to Bankroll Loans, or they had to go through the paperwork-heavy process of selling Loans on the Secondary Market. (*See* Michael W. Hudson, "*The Monster: How a Gang of Predatory Lenders and Wall Street Bankers Fleeced America—and Spawned a Global Crisis*," pgs. 26-27 [2010]).

17. Securitization of Consumer Debt provided a fertile ground for unscrupulous corporate executives to operate their Mortgage lending institutions as control frauds (a financial weapon against society). These executives developed an "originate and sll" paradigm in consumer lending which allowed them to streamline their focus on making enormous compensation through volume, and to forget Loan quality altogether.

18. These top lending industry executives operated their companies as control frauds by rigging financial incentives to provide the greatest economic rewards to their staff and to Brokers for generating the highest quality of Loans possible, and to substantially penalize anyone who did not go along with the scheme by either reducing their pay or terminating their employment.

19. The originators of Liar's Loans knew (or through the exercise of reasonable care should have known) that these Loans were statistically probable to result in Mortgage defaults and foreclosure.

## VI.   STATEMENT REGARDING UNDERWRITING GUIDELINES

20. Mortgage Loan underwriting guidelines are intended to assess the creditworthiness of the Borrower, the ability of the Borrower to repay the Loan, and the adequacy of the Mortgaged property as security for the Loan. The normal parameter considered when underwriting are the amount of the Loan, the Borrower's income, Debt and Credit history, savings and Debt-to-Income Ratio, together with the appraised Value of the property, and the Loan-to-Fair Market Value Ratio.

21. "Fannie Mae views Lenders as our partners in ensuring the continued viability of the residential lending market and the continued availability of affordable Mortgage financing for home purchases and refinancing. We rely on lenders to make underwriting decisions that result in 'investment quality' Loans; that is, Loans for which it has been established that there is a reasonable expectation that the Borrower is able and willing to repay the Mortgage debt and that the property constitutes sufficient security for the Mortgage.

In turn, lenders rely on appraisers to provide them with thorough, accurate and objective appraisal reports that result in reliable opinions of Market Value so they can make prudent underwriting decisions. The appraisal is used to judge the property's acceptability for the Mortgage Loan requested in view of its Value and Marketability.

The underwriter will use the information provided in the appraisal report, along with other data, to determine whether theproperty meets FannieMae's requirements for an investment quality Loan. **FannieMae expects the lender to**

**place as much emphasis on underwriting the property and reviewing the**
**appraisal as on underwriting the Borrower's worthiness**.

Therefore, it is important for the appraiser to provide the lender with a reliable
opinion of the market Value of the property with the adequate and accurate data
supporting the conclusions of the appraisal report. (*Also See*, the "*Guide to*
*Underwriting with DU*", FannieMae, July 2005, Chapter 6: "Quality Assurance for
DU Loans", pg. 198), which states: "The lender must verify data integrity by
checking the information provided on the Loan Application, the Closing
Documents, and all data analyzed by DU. The data includes, but is not limited to,
the Borrower's name and Social Security Number, property address, property
type, Mortgage Term, Mortgage type, Loan purpose, Loan amount, LTV, CLTV,
employment, income, assets, liabilities, Section VII, and Section VIII."

22. The appraisal the is requisite to computing the LTV Ratio or CLTV Ratio
(Combined Loan-to-Value Ratio) and verifying the data integrity in a Loan
Application MUST COMPLY with the Uniform Standards of Professional
Appraisal Practice. (*See* "*Appraisal and Property Report Policies and Forms*
*Frequently Asked Questions (FAQ's)*", FannieMae, March 2009, pg. 1, which
states: "FannieMae recognizes the Uniform Standards of Professional Appraisal
Practice as the minimum appraisal standards for the appraisal industry, and also
establishes separate appraisal requirements to supplement the Uniform
Standards."

      VII.    STATEMENT REGARDING REAL ESTATE APPRAISALS

23. Title 12 United States Code – "Banks and Banking", regulates the national Mortgage lending Industry and requires a lender to order an appraisal of the property prior to originating a Mortgage Loan securing a Lien against the property, whenever the transaction is federally related (involving an entity or activity regulated by a federal Agency) or connected to Mortgage-Backed Securities. (*See* 12 U.S.C. § 3342, "Transactions Requiring the Services of State Certified Appraiser"; 12 U.S.C. § 3343, "Transactions Requiring the Services of State Licensed Appraiser", 12 U.S.C. § 3350(4), "Federally Related Transaction", and 12 U.S.C. § 3350(5), "Real Estate Related Finance Transaction).

24. The Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub. L. 101-73, 103 Stat. 183, enacted August 9, 1989, is a United States federal law enacted in the wake of the Savings and Loan Crisis of the 1980's. Title XI of FIRREA (12 U.S.C. §§ 3331-3351) created an oversight structure for appraisers that involves State, federal and private entities.

25. FIRREA requires real property appraisals to comply with the Uniform Standards of Professional Appraisal Practice (USPAP).

26. The USPAP requires Appraisers to conduct their appraisals independently. (*See* 12 C.F.R. § 225.65(a), Appraiser Independence).

27. The Appraiser's role is to provide an objective, unbiased opinion of Value to the lender. (*See* 12 C.F.R. § 225.62(a): which states, "Definitions – a) *Appraisal* means a written statement independently and impartially prepared by a qualified Appraiser setting forth an opinion as to the Market Value of an adequately

described property as of a specific date(s), supported by the presentation and analysis of relevant Market information."

28. The Appraiser works for the lender, not the owner, buyer or seller, even if one of them pays for the appraisal.

29. The Office of Thrift Supervision (OTS) has uncovered many instances of improper appraisals. After reviewing hundreds of Loan Files, the OTS Appraisal expert found that "numerous instances were identified where, because of undue influence on the Appraiser, values [of property] were increased without supporting documentation. OTS had also found that violations of the Agency's Appraisal Regulations to comply with Appraisal independence were rampant in the financial industry, and their investigation had concluded that many lenders influenced Appraiser practices that constituted "unsafe or unsound banking practices".

30. Plaintiff has reason to believe that the OTS's findings that the practice of violating the Uniform Standards of Professional Appraisal Practice (USPAP) is a form of Corrupt Enterprise and the financial industry pattern and practice of violating these standards are actionable under R.I.C.O.

31. The Loan-to-Fair Market Value Ratio of a Mortgage Loan, or LTV, is the Ratio of the balance of the Mortgage Loan to Value of the mortgaged property when the Loan is made.

32. The LTV Ratio is among the most important measure of a Mortgage Loan, and thus, it is one of the most important indicators of the default risk of the Mortgage Loan. The lower the Ratio, the less likely that a decline in the Value of the

property will wipe out the owner's equity. The lower the LTV, the greater the "equity cushion". The higher the LTV, the greater the risk of Loan Default and Mortgage foreclosure.

33. Thus, the LTV Ration is a material consideration to a reasonable lender or Borrower in deciding whether to contract for a Mortgage Loan.

## VIII.   THE STATUTE OF LIMITATIONS

34. "Injury Discovery" is the default method of statute of limitations accrual in many federal actions, including R.I.C.O. (*See Pacific Harbor Inc. v. Barnett Bank, N.A.*, 252 F. 3d 1246, 11th Cir., 2001; citing *Rotella v. Wood*, 528 U.S. 549, [2000]), stating: "The Statute of Limitations. We assume, without needing to decide, that the statute of limitations period starts from the date of discovery of the injury. Under the injury discovery rule, unless tolled, the statute of limitations under R.I.C.O.  is four years from the date the Plaintiff knew it was injured. (*Rotella*, 528 U.S. 549, 552-53; 120 S. Ct. 1075; 145 L. Ed. 2d 1047, [2000]).

35. Under the discovery rule, an action accrues on the earlier of the date on which the actionable injury in fact is discovered or should have been discovered by exercise of reasonable diligence. The accrual date triggers the period of limitations, which is four (4) years from the date the Plaintiff knew he or she was injured. In other words, the statute of limitations is suspended or "tolled" until the Plaintiff knows that he or she has an actionable injury in fact, and the has four years to file suit.

36. Plaintiff's actual injury of fact accrued on January 28, 2005 and October 18, 2006, respectively. The first accrual date is for Plaintiff's property located at 1584

North Avenue, Bridgeport, CT 06604, and the second accrual date is for

Plaintiff's property located at 757-759 Iranistan Avenue, Bridgeport, CT 06604.

37. Plaintiff learned of the facts about the misrepresentation of the Appraisal of both

properties after doing some research about the subject matter of this Complaint

on December 4, 2018.

38. This suit is timely filed within the four year statute of limitations starting from the

date that Plaintiff knew in fact that he was injured.

## VII. STATEMENT REGARDING STATUTE OF LIMITATIONS

39. Under Article III of the united States Constitution, a Plaintiff must have sustained

some injury in fact in order to have a justiciable "case or controversy", *i.e.*, in

order to have Standing and jurisdiction to bring a suit in federal Court. The

Supreme Court has stated, in defining what sometimes is referred to as a "Lujan

Injury", that "over the years, our cases have established that the irreducible

constitutional minimum of Standing contains three (3) elements." A Plaintiff must

show that (1) he has suffered or is in imminent danger of suffering an actual,

concrete injury, (2) proximately cause by the [mis]conduct of the Defendant, and

(3) that the Court has jurisdiction over the parties and issues necessary to

redress the injury. (U.S. CONST. Art. III, § 2; *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 [1992]; *see also Massachusetts v. Mellon*, 262 U.S. 447, 488

[1923]).

40. In order to file a federal R.I.C.O. action, injuries must be non-speculative (actual)

and calculable (concrete). (*See McLauglin v. Am. Tobacco Co.*, 522 F. 3d 215A

[2d. Cir. 2008], holding that Plaintiff asserting a Civil R.I.C.O. claim for injury to

business or property must allege actual, quantifiable injury; *Mendoza v. Zirkle Fruit Co.*, 301 F. 3d 1163 [9th Cir. 2002], stating that legally documented agricultural laborers have Standing to bring R.I.C.O. action since laborers alleged concrete, actual injury in form of lost wages, and award of money damages would redress such injury; *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F. 3d 884 [6th Cir. 2000], stating that Plaintiff must plead and prove an actual injury to its business or property by reason of Defendant's R.I.C.O. transgression; *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F. 2d 1303 [9th Cir. 1992], stating that not all R.I.C.O. injuries are compensable thereunder; showing of "injury" requires proof of concrete financial loss; *certiori* denied, 507 U.S. 1004 [1993]).

41. An actionable injury denotes far more than a mere harm or loss. Black's Law Dictionary defines an injury as: "The violation of another's legal right, for which the law provides a remedy; a wrong or injustice…Authorities distinguish harm from injury, holding that while harm denotes any personal loss or detriment, injury involves an actionable invasion of a legally protected interest. (8th Edition, 2004).

42. Since a concrete, non-speculative injury is required for Standing to file a R.I.C.O. claim, such an injury must also be required to trigger the running of the Statute of Limitations. This was exactly the point the Second Circuit correctly attributed to the Supreme Court, "until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a Civil R.I.C.O. action cannot be held to have accrued." (*Bankers Trust Co. v. Rhoades*, 859 F. 2d 1096, 1103 [2d Cir. 1988], quoting *Sedima, S.P.R.L. v. Imrex Co*. 473 U.S. 479, 496 [1985]).

43. The Eleventh Circuit has designated two distinct Time Points for determining injury discovery accrual: "Inquiry Notice" and a "Period of Reasonable Diligence".

> Time Point #1:
>
> "Inquiry Notice is 'the term used for knowledge of the facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed.'"
>
> Time Point #2:
>
> "Once Inquiry Notice occurs, a prospective Plaintiff enters a period of reasonable diligence, which is the time necessary, exercising ordinary investigation, to ascertain sufficient facts to file a complaint."

44. "In turn, Inquiry Notice triggers reasonable diligence in investigating the fraud for which notice has been received in order to obtain sufficient information to file suit." (*See Tello v. Dean Witter Reynolds, Inc*., 410 F 3d 1275, 1283 [11[th] Cir. 2005] and *Tello v. Dean Witter Reynolds, Inc*., 494 F. 3d 956, 968 [11[th] Cir. 2007], "Inquiry Notice in our Circuit occurs when there is a factual evidence of the possibility of Securities Fraud that would cause a reasonable person to investigate whether his or her legal rights had been infringed."

45. In discussing Time Point #2 above, the Eleventh Circuit referenced the beginning of a "Period of Reasonable Diligence." This "Period of Reasonable Diligence" begins upon "Inquiry Notice" *i.e.*, when a "reasonable person" should have been aware of "storm warnings." The "Period of Reasonable Diligence" ends upon "Injury Discovery Accrual," *i.e.*, when a "reasonable person" should have discovered "sufficient facts to file a complaint."

46. In *Tello I*, the Eleventh Circuit remanded the case to the District Court to hold hearings to specifically identify the "what" and the "when" of these two essential Time Points. (*See Tello I*, 410 F. 3d at 1294).

"We remand this case to the District Court to determine the essential, preliminary factual issues that we need to proceed with a legal determination of the applicable statute of limitations:

(1) What established Inquiry Notice to the Plaintiff class, and when did that occur? And

(2) When did the Plaintiff class have sufficient information to file suit?

47. The Eleventh Circuit coined the term "Inquiry-Notice" analysis. By hyphenating the term of "Inquiry-Notice", the Eleventh Circuit reflected the same two-part analysis shown in the foregoing "Injury Discovery Accrual Formula." The hyphenation separates the (1) duty of inquiry from (2) notice or discovery of information needed to file suit.

"We conducted our Inquiry-Notice analysis by explaining that 'the task for the District Judge on remand will be to determine the point in time when the Plaintiff Class had sufficient information of the alleged fraudulent Securities conduct by Dean Witter to file this Class Action.' We stated the two questions that we wanted answered on limited remand: (1) What established Inquiry-Notice [storm warnings] to the Plaintiff Class, and when did that occur? And (2) When did the Plaintiff Class have sufficient information to file suit [injury discovery]?" (*Tello II*, 494 F. 3d at 968, quoting *Tello I*, 410 F. 3e at 1294).

48. The Sixth Circuit stated, consistently with the Eleventh Circuit's more recent holdings in *Tello I* and *Tello II*, "Defendant suggests that the limitations period is triggered when the Plaintiff learns facts that would cause a reasonable Plaintiff to investigate the possibility of fraud. Some cases support that suggestion. (*See, e.g. Theoharous*, 256 F. 3d at 1228). The majority view however, is that knowledge of suspicious facts – "storm warnings", they are frequently called – merely triggers a duty to investigate, and that the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud. (*See New England Healt Care Employees Pension Fund v. Ernst & Young*, 336 F. 3d 495, 501 [6th Cir. 2003]).

49. Since "Inquiry Notice", (Time Point #1 in the formula above) has historically referenced that point in time when a "duty of inquiry" arises based on the objective "reasonable person" test, it should retain only that moniker. The second essential point in time (Time Point #2 in the formula above) is in fact the time, based on the objective "reasonable person" test an actionable injury in fact should have been discovered under "injury discovery" principles. This latter point in time, when the claim accrues and the statute of limitations begins to run, is the principal focal point. However, to determine the time the claim accrues based on an objective reasonable person test, it is equally essential to pinpoint that time when the "reasonable person" first had a duty to initiate diligent inquiries, i.e. "Inquiry Notice." (*See Law v. Medco Research, Inc.*, 113 F. 3d 781, 785 [7th Cir. 1997], *Tello v. Dean Witter Reynolds, Inc.*, F. 3d 1275, 1283 [11th Cir. 2005]).

50. Tello I and Tello II also specified facts which must be determined in the trial Court, preferably by a jury. First, the trier of fat must identify the proximate point in time that a reasonable person should have discovered "storm warnings" sor should have become suspicious and must identify "what" would have cause a reasonable person to make such a discovery. Second, the trier of fact must identify the proximate time a reasonable person should have discovered his/her injury in fact and identified "what" would have caused a reasonable person to make such a discovery.

51. By combining the terminology and holdings of the Seventh and Eleventh Circuits, one can arrive at a clear and manageable formula to determin when a cause of action accrues. "Storm warnings" trigger the Period of Reasonable Diligence." This "Period of Reasonable Diligence" ends when a reasonable person should have discovered (or the Plaintiff actually discovers at an earlier date) his/her injuries, regardless of whether inquiries were actually made. The statute of limitations begins to run only when the "Period of Reasonable Diligence" has culminated upon actual or constructive injury discovery.

52. This formula helps a Plaintiff determine what must be discovered and when it must be discovered and when it must be discovered. The de facto tolling principles and application of the reasonable person standard also ensure that valid claims will not be time-barred due to circumstances beyond a Plaintiff's control.

53. Equitable and estoppel tolling principles are uniformly applicable in federal cases to prevent running of the statute when essential facts are concealed from

Plaintiff, whether or not the concealment is fraudulent. As stated by the U.S.

Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gibertson*, 111 S.

Ct. 2773; 501 U.S. 350, 363-64 [1991], quoting *Bailey v. Glover*, 21 Wall. 342,

348 [1874], stating: "time requirements in law suits…are customarily subject to

'equitable tolling'. (Irwin v. Veterans Administration, 498 U.S. 89 (slip op. 5)

[1990], citing *Hallstrom v. Tillamook County*, 493 U.S. 20 (slip op. 6) [1989].

Thus, this Court has said that in the usual case, "where the party injured by the

fraud remains in ignorance of it without any fault or want of diligence or care on

his part, the bar of the statute does not begin to run until the fraud is discovered,

though there be no special circumstances of efforts on the part of the party

committing the fraud to conceal it from the knowledge of the other party." [*i.e.*,

even with no fraudulent concealment] *Bailey v. Glover*, 21 Wall. 342, 348 [1874],

*see also Holmberg v. Armbrecht*, 327 U.S. 392, 396-397 [1946]).

54. Thus, the statute of limitations does not run while the Plaintiff is unaware of the

fact of the fraud upon his rights, i.e., unaware of his "injury by the fraud."

Equitable tolling of the statute continues even after "Inquiry Notice," i.e., even

after a "reasonable person" of ordinary intelligence would be able to discover

essential facts necessary to file suit. After the essential facts necessary to file suit

are discovered or should have been discovered, equitable tolling ceases and

Plaintiff has the full statutory period in which to file suit. (*See TRW, Inc. v.*

*Andrews,* 534 U.S. 19, 30 [2001], discussing the "reasonable person" and the

triggering of the limitations period in the context of an alleged violation of the Fair

Credit Reporting Act (FCRA)).

55. Thus, the point in time when equitable tolling ceases – i.e., when the facts needed to file suit are discovered or discoverable – is the same point in time when a statute runs under "injury discovery" accrual principles.

56. During the years 2005 through 2011, millions of objectively reasonable Americans, including Plaintiff, became aware through the Internet and mainstream media news of the Housing Bubble and its collapse, and the resulting harm to Americans nationwide, including millions of homeowner experiencing the loss of equity in their home to the point that they owed more on their Mortgage than their property was worth; and the Economic Crisis with hundreds of Bank and Mortgage Lender failures with thousands of Investors losing their investments in Mortgage-Backed Securities schemes, and thousands of small business failures with millions of worker experiencing the loss of their jobs resulting in large-scale unemployment; and the Mortgage crisis continues with millions of homeowners losing their homes through fraudulent Mortgage foreclosures. These financial industry fraudulent practices are actionable because they constitute an actual harm and the fact that the Defendant(s), and each of them, are among the financial institutions engaged in the enterprise of fraudulently misrepresenting the appraisal values of Plaintiff's homes, these fraudulent practices also constitute an actual injury.

57. During the years 2008 through 2011 millions of objectively reasonable Americans, including Plaintiff, became aware, through the Internet, and through mainstream media news of thousands of foreclosure cases clogging the Courts; thousands of "lost Note" cases; widespread confusion among homeowners as to

who is the actual owner of their Mortgage Loan; and the widespread use by Mortgage Servicers of document mills using "Robo-Signers" to forge counterfeit signatures on thousands if not millions of Mortgage related documents for the sole purpose of foreclosing on Mortgages. Lost Notes, confusion over the actual ownership of the Promissory Note and Mortgage, and fabricated foreclosure documents with forged signatures have served as a "storm warning" to Americans of the foreclosure fraud epidemic, but not so much of the particulars concerning Mortgage fraud, and this Court must not turn a blind eye to the reality of the epidemic and what Plaintiff respectfully moves this Court for redress of the grievance created by the Defendant(s), and each of them, for remedy.

58.   During the years 2005 through 2009 millions of Americans, including Plaintiff, had no reason to suspect that the national Subprime Mortgage Industry created the Housing Bubble and the Mortgage Crisis through false misrepresentations and predatory lending. This is because the parties who conducted the widespread systematic Mortgage fraud alleged herein were presumably reputable and financially stable institutions which the Public at Large had been doing business with for years without incident; because during the last decade the government regulators did nothing to prosecute the wrongdoers; and because our government officials, told Americans that "the Banks may have ventured into the realm of moral hazard, but they did nothing illegal"; thus, giving our whole society the false impression that homeowners had no actionable injury.

59.   Additionally, during the years 2000 through 2006 the pattern of Subprime Mortgage Brokers and Originators pressuring Appraisers to inflate property

Appraisals occurred on such a massive scale that such conduct resulted in the
inflation of housing prices nationwide with entire housing markets becoming
inflated, thereby obscuring from public view the individual acts of inflating
Appraisals. (*See* S & P/Case-Shiller Home Price Indices, McGraw-Hill Financial,
January 2012).

60. Thus, during the years 2000 through 2009 millions of objectively reasonable
Americans, including Plaintiff, were without being aware of the Inquiry Notice of
actionable injury.

61. The first significant "storm warnings" to Americans of Mortgage lending fraud
came in the testimony William K. Black before the House Financial Services
Committee on April 20, 2010. (*See* "Public Policy Issues Raised by the Report of
the Lehman Bankruptcy).

62. In the April 20, 2010 hearing before the House Financial Services Committee,
Black testified about the role that Alt-A Mortgages (what he called "Liar Loans")
on residential Real Estate played in the downfall of Lehman Brothers. Black's
testimony was that "Lehman's failure is a story in large part of fraud. And it is
fraud that begins at the absolute latest in 2001, and that is with their Subprime
and Liar's Loan operations." Black said that the occurrence of fraud in "Liar's
Loans" was at 90 percent.

63. Black's credentials give credibility to his allegations of fraud conducted by
Subprime Mortgage Lending institutions. Black explains his credentials to the
House Financial Services Committee as follows:

"I begin with a short description of my background that is relevant to your questions. My primary appointment is in economics. I have a joint appointment in law. I am a white-collar criminologist. My research specialization is financial fraud by elites and financial regulation. I was senior regulator during the S&L debacle (and had the honor of testifying many time before this Committee). As a regulator, I was –

- The Litigation Directior of the Federal Home Loan Bank Board. We had independent litigation authority. We were not represented by the Justice Department

- The Deputy Director of the Federal Savings and Loan Insurance Corporation (FSLIC)

- The Staff Leader of the re-regulation of the S&L Industry in 1984-1984

- The Senior Vice President and General Counsel of the Federal Home Loan Bank of San Francisco (FHLBSF)

- The Senior Deputy Chief Counsel for Enforcement and Litigation (West Region) of the Office of Thrift Supervision (OTS)

- The Deputy Staff Director of the National Commission on Financial Institution Reform, Recovery and Enforcement (NCFIRRE)

Several aspect of this background may be of particular use to the Committee.

- The Bank Board was both a safety and soundness regulator and Securities Regulator for publicly traded Savings & Loan

Holding Companies. We were vigorous in bringing actions against those that abused the accounting rules.

- I (Black) worked extensively, and cooperatively with many other regulatory agencies.

- The Federal Home Loan Banks (before the passage of FIRREA in 1989) were similar to the Federal Reserve Banks. The FHLB's had Board of Directors dominated by industry members and had both a lending function and a regulatory function. We used the information gained through, and the leverage inherent in, the FHLBSF's lending activities to aid our and our sister agencies', supervisory effectiveness.

- We always made extensive referrals to the SEC, the FBI and the Department of Justice when we found evidence of unsafe and unsound practices or violations of law. I was one of the Officials charged with making sure that these referrals became far more effective. One result was that the government obtained over 1000 felony convictions of S&L insiders and those that aided and abetted their frauds.

64. The Public at Large first "storm warnings" came in 2010 with the Financial Crisis Inquiry Commission Report from Congress and in November 2011 when learning about William K. Black and his testimony before the House Financial Services Committee via the Internet.

65. When Plaintiff suffered financial difficulty from the depressed economy and began to be targeted by the Banks who purported held his Mortgage he sought legal assistance that was not amenable to his situation and he was compelled to investigate the possibilities of Mortgage fraud in his Mortgage Loan, which lead him to discover the fact that the Defendant(s) Original Lender 1 and Original Lender 2 misrepresented the Value of Plaintiff's property in both Mortgages with each purported Defendant Original Lender, where said Mortgage Loans were false and inflated.

66. On December 4, 2018, Plaintiff has secured a copy of the County Records assessment of the Value of the property for each Mortgage with the two Defendant Original Lenders for the years 2005 and 2006 respectively.

67. Plaintiff compared the representation that Defendant(s) Original Lender 1 and Original Lender 2 used to create the Promissory Notes and Mortgages dated January 28, 2005 and October 18, 2006, respectively. Based upon the newly discovered evidence, Plaintiff has learned that he has an actionable injury in fact for Mortgage fraud involving a false an inflated Appraisal overstating the Fair Market Value of each of the Mortgages he was fraudulently induced into signing with Defendant(s) Original Lender 1 and Original Lender 2.

## IX.   THE ALLEGED MISCONDUCT

68. Defendant(s) Original Lender 1 and Original Lender 2 committed the offence of Mortgage fraud, with the intent to defraud, in violation of Connecticut General Statute (CGS) § 53-379a, which states: "(a) A person commits residential Mortgage Fraud when, for financial gain and with the intent to defraud, such

person – (1) knowingly makes any material written misstatement, misrepresentation or omission during the Mortgage lending process with the intention that a Mortgage lender, Mortgage correspondent lender, or Mortgage Broker, as defined in CGS § 36a-485, a Borrower or any other person that is involved in the Mortgage lending process will rely on such written misstatement, misrepresentation or omission; (2) knowingly uses or attempts to use or facilitate the use of any written misstatement, misrepresentation or omission during the Mortgage lending process with the intention that a Mortgage lender, Mortgage correspondent lender, as defined in CGS §  36a-485, Borrower or any other person that is involved in the Mortgage lending process relies on it; (3) receives or attempts to receive proceeds or any other funds in connection with a residential Mortgage closing that the person knew or should have known resulted from an act or acts constituting residential Mortgage fraud; (4) conspires with or solicits another to engage in an act or acts constituting residential Mortgage fraud.

69. Defendant(s) Original Lender 1 & 2 acts and conduct is a felony crime under (CGS) § 53-379a(b)(1)(2).

70. To state a cause of action for fraud in the inducement, a Plaintiff must allege the following:

    a)  A misrepresentation of a material fact;

    b)  That the Representor knew or should have known of the statement's falsity;

    c) That the respresentor intended that the representation would induce another to rely on it; and

    d) That the Plaintiff suffered injury in justifiable reliance on the representation.

71. In accordance with the foregoing facts and law delineated by Plaintiff regarding violations of federal statutes specified herein, and in accordance with the facts and law delineate by Plaintiff regarding violations of (CGS) § 53-379a, Defendant affirmatively alleges that the Defendant(s) Original Lender 1 & 2 fraudulently induce Plaintiff into a contract for a Mortgage Loan, as follows:

    (1) Defendant(s) Original Lender 1 & 2 misrepresented the Value of the subject property based upon an inflated Appraisal which overstated the Value of the subject property based upon an inflated Appraisal which overstated the Value of the property, and Defendant Original Lender 1 & 2 misrepresented the risk to Plaintiff of Loan default and Mortgage foreclosure by understating the Loan-to-Value Ratio in the Loan documents;

    (2) Defendant(s) Original Lender 1 & 2 knew or should have known that these representations were false;

    (3) Defendant(s) Original Lender 1 & 2 had a duty to truthfully represent the Value of the Plaintiff's properties and Defendant(s) Original Lender 1 & 2 violated that duty by using a false and inflated Appraisal overstating the Value of the subject property(s) to justify the Loan amount at the Mortgage contract Closing.

(4) Defendant(s) Original Lender 1 & 2 falsely overstated the Value of the property(s) in the Loan documents.

(5) Defendant(s) Original Lender 1 & 2 falsely understated the Loan-to-Value Ratio in the Loan documents, thereby misrepresenting to Plaintiff the risk of loan default and Mortgage foreclosure.

(6) Plaintiff would not have agreed to these misrepresentations by Defendant(s) Original Lender 1 & 2 had Plaintiff known and understood the nature of these misrepresentations in the Loan documents.

### X.    THE BASIS OF ALLEGED LIABILITY

72. Defendant(s) Original Lender 1 & 2's false representation are the actual and proximate cause of damages to Plaintiff.

73. The United States Court of Appeals for the Sixth Circuit explains Plaintiff's theory of damages in the case of *In re Sallee*, 286, F. 3d 878 (2002), as follows: "In Kentucky, when a party in induced by a fraudulent misrepresentation to enter into a contract, that party must elect to either – (1) affirm the contract and recover damages in tort for the fraud; or (2) disaffirm the contract and recover the consideration with which he has parted. (*H.C. Hanson v. Am. Nat'l Bank & Trust Co.*, 865 S.W. 2d 302, 306 [Ky., 1993]; The election required is between the available remedies – either affirming the contract and claiming damages or rescinding the contract. Sanford Constr. Co. v. S & H Contractors, Inc. 443 S.W. 2d 227, 236 [Ky., 1969]; Under Kentucky law, as found by the majority, the Sallees may recover the difference between the Value of the property as it was

fraudulently represented and the actual Value of the property. *Dempsey v. Marshall*, 344 S.W. 2d 606, 607 [Ky., 1961]).

74. For Plaintiff, rescission of contract is not a meaningful remedy in the context of the Defendant(s) predatory scheme of inducing Plaintiff to sign a Promissory Note and Mortgage exceeding the Value of the subject property. Plaintiff therefore elects to affirm these contracts and recover damages in tort for the fraud.

75. Accordingly, Plaintiff seeks to recover the difference between the Value of the subject property as it was fraudulently represented and the actual Value of the property(s) at the time of the signing of the Loan and Mortgage contracts.

76. Defendant(s) Original Lender 1 & 2 represented the Value of the subject property(s) at the time of the signing of the Loan and Mortgage documents as $310,000.00 for the property located at 1584 North Avenue, Bridgeport, CT 06604 and $210,000.00 for the property located at 757-759 Iranistan Avenue, Bridgeport, CT 06604.

77. The property Appraiser for Fairfield County at Bridgeport assessed the Value of the subject property located at 1584 North Avenue, Bridgeport, CT 06604 during the year 2005 as $149,000.0 and the subject property located at 757-759 Iranistan Avenue, Bridgeport, CT 06604 during the 2006 as $108,000.00. (See Exhibit "2" & "3", Bridgeport City Assessor's Readout for Plaintiff's properties).

78. The Bridgeport City Assessor's Appraisal of the Value of the Plaintiff's properties is a Public Legal Appraisal reflecting the government's position of the actual Fair Market Value of the property during the particular year at issue in this Complaint,

upon which the County property taxes are assessed. This government

assessment of the Value of the property is consistent with the 110-year mean for

housing prices, as adjusted for inflation of the currency.

79. Defendant(s) Original Lender 1 & 2's representation of the value of the subject

property is inflated and egregiously above the amount of the Bridgeport City

Appraisal.

80. The difference between these two amounts is $250,000.00 .

81. That makes the actual damages Plaintiff was injured being $250,000.00. This

amount is allowed to be tripled under Civil R.I.C.O. remedies.

82. The Mortgage Loan is called the "benefit of the bargain", which must be repaid

when affirming the contract and claiming damages for fraud in the inducement.

83. The balance of the Loan amount is set off from the R.I.C.O. damages, and

credited to any existing Mortgage Loan balance.

84. The Loan amount to Plaintiff was $310,000.00  and $210,000.00 respectively.

85. The balance of the Loan in the amount of $310,000.00  and $210,000.00 is to be

subtracted from the Civil R.I.C.O. damages as a set-off, thereby satisfying the

Mortgage.

86. Defendant(s), and each of them, are liable to Plaintiff for treble damages, minus

the Mortgage Loan amount together with Satisfaction of Mortgage.

### XI.    THE ALLEGED WRONDOERS

87. The Liar's Loan Enterprise is a subset of the national Subprime Mortgage

Industry, including all of the top executives of the top Subprime Mortgage

Originators, the top Subprime Mortgage-Backed Securities Issuers, the top

Subprime Mortgage Servicers, the National Appraisal Management Companies, the nationwide network of Mortgage Brokers, certain institutional investors, and Federal Reserve Chairmen Alan Greenspan and Ben Bernanke who played a significant role in the creation of millions of predatory Loans originated nationwide between the years 1997 through 2008.

88. The pattern conducted by these Subprime Mortgage Originators of using a false and inflated Appraisal overstating the property Value to misrepresent the Loan-to-Value Ratio in Mortgage Loan Documents has been occurring continuously from 1997 to the present time, and has every indication of continuing into the future. (*See* J. Kevin Murry, "Issues in Appraisal Regulation: The Cracks in the Foundation of the Mortgage Lending Process, Loyola of Los Angeles Law Review, June 2010).

89. In "Lenders Put the Lies in Liar's Loans and Bear the Principal Moral Culpability", William K. Black, New Economic Perspectives (October 2011), Black explains who is culpable:

> The Fraud "Recipe" for Lenders –
>
> "The reason that accounting control frauds characteristically engage in lending behavior that no honest lender would exhibit was that these perverse practices maximized reported short-term income and the executive's compensation. There is a four-ingredient fraud "recipe" for lenders.
>
> > 1.  Extreme growth through making

2. Exceptionally bad Loans at a premium yield (very high interest rate) which economists referred to as the "Housing Bubble". These resources include the "Securitization" of consumer debt, which made available to the Mortgage lending industry hundreds of billions of dollars annually of "other people's money" and a new "originate and sell" paradigm within the consumer lending industry; thousands of property Appraisers who acquiesced to inflating Appraisals under "meet the numbers" in the Loan documents (or be blacklisted) pressures by Mortgage lenders and their Brokers; and a hungry market of renters and homeowners who exhibited "irrational exuberance in their receptivity to mortgaging and refinancing their way into achieving the American Dream.

3. Defendant(s) Original Lender 1 & 2 participated in the Liar's Loans Enterprise affairs through a pattern of racketeering activity involving the brokering, originating, bundling, selling into the Secondary Market, Servicing, and foreclosing on Liar's Loans made with inflated, overrated, false Appraisal of the subject property(s).

### XII.   THE R.I.C.O. PATTERN

90. On September 21, 2010, William K. Black testified before the Financial Crisis Commission about the role of fraud in the financial crisis. In his overview of his key findings, Black effectively outlined the pattern of racketeering activity

conducted by the Liar's Loans Enterprise during the years 2001 through 2008, wherein the top executives within the national Subprime lending industry operated their organizations as control frauds by making intentionally bad loans at premium yield to produce extreme growth, coupled with extreme leverage and grossly inadequate loss reserves, to produce executive compensation – at the expense of the company and society as a whole. (See Testimony Before the Financial Crisis Commission, Miami, Florida, September 21, 2010).

91. There is no **honest** reason why a Mortgage lender would inflate the appraised Value and size of the loan. Causing or permitting large numbers of inflated Appraisals is a superb "marker" of accounting control fraud by the lender because the senior officers directing an accounting control fraud do maximize short-term reported (fictional) income (and real losses) by inflating Appraisals and stated income. Lenders and their Agents frequently suborned Appraisers by deliberately creating a Gresham's dynamic to try to induce them to inflate market values, leaked the Loan amount to the Appraisers, drove the Appraisal fraud, and made it endemic. A national poll of Appraisers in early 2004 found that 75% of respondents reported being subjected to coercion in the last 12 months to inflate Appraisals. A follow up survey in 2007 found that the percentage that had bee subjected to coercion had risen 90%. Appraisers reported that when they refused to inflate Appraisals 68% had lost at least one client and 45% were not paid for at least one Appraisal in the prior 12 months.

XIII. <u>FAILURE TO PROVIDE VALUE TO FUND THE MORTGAGE</u>

92. Defendant(s) Original Lender 1 & 2, did not provide any money to fund the fraudulently induced "Liar's Loan".

93. Plaintiff gave Defendant(s) Original Lender 1 & 2 money for the down payment of the fraudulently inflated Mortgage and signed a Promissory Note to commit to the performance and obligation of the Mortgage, which was the only currency exchanged between Plaintiff and Defendant Original Lender 1 & 2 in the purported Mortgage Loan transaction at the inception of the Mortgage.

94. The Defendant(s) Original Lender 1 & 2 got Plaintiff's down payment and Promissory Note without loaning Plaintiff anything of Value to attach to the security in violation of U.C.C. § 9-203(b).

95. The Defendant Original Lenders deposited Plaintiff's Notes into a transactional checking account, and did not tell Plaintiff as the depositor of said checking account where Plaintiff's Note was deposited, he was the Creditor of the money they deposited in an account in Plaintiff's name.

96. NO LOAN EVER TOOK PLACE. The Defendant Original Lenders exchanged a check of equal value from an account which they deposited the Note Plaintiff signed, so neither Defendant Original Lender actually put up any of their own money to fund the purported Mortgage and Note.

97. The Defendant Original Lenders had no right to sell Plaintiff's Mortgage and Note because the Plaintiff's Note was deposited into an account in Plaintiff's name, and the money to fund the Mortgage was withdrawn from that account without Plaintiff's authorization.

98. The Seller of the property received a check. The money deposited for the check came from the Plaintiff's Note that was deposited as a Cash Item on the Defendant Original Lender's books. Therefore, the Defendant Original Lenders had no right to the Plaintiff's Mortgage and Promissory Note until they contributed Value to those instruments to attach any claim or right to Plaintiff's property.

99. The Defendant Original Lenders never consummated the Loan, but kept Plaintiff's Mortgage and Promissory Note and transferred the equitable interests of Plaintiff's property to their Successors, Assigns, and Agents who have obtained a benefit from the Defendant Original Lender's fraudulent inducement of the Mortgage Loan, and fraud in the factum of failing to put up anything of Value to attach to the Plaintiff's property.

100.   Courts, while refusing to maintain any action upon the unlawful contract have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the Defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.

101.   "When a contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suitor

action, nor does the Doctrine of Estoppel apply." (*F & PR v. Richmond*, 133 SE
898; 151 Va. 195).

102.     "A national bank…cannot lend its credit to another by becoming a surety,
indorser or guarantor for him. Such an act; is *ultra vires*…". (*Merchants Bank v.
Baird*, 160 F. 642).

XIV.   THE QUESTION OF LAWFUL CONSIDERATION

103.     The issue of whether the lender who writes and passes a "bad" check or
makes a "credit" loan has a claim for relief against the Borrower is easy to
answer, providing that the lender can prove that he gave a lawful consideration,
based upon lawful acts. But, did the lender give lawful consideration? To give a
lawful consideration, the lender must prove that he gave the borrower lawful
money such as coins or currency. Failing that, he can have no claim for relief in a
Court of law against the Borrower as the lender's actions were *ultra vires* or void
form the beginning of the transaction.

104.     The question of valuable consideration in this instant action, does not
depend on any Value imparted by the lender, but the false confidence instilled in
the Plaintiff by the Defendant Original Lenders to induce him into believing the
Appraisal of the Mortgaged properties and that they actually loaned Plaintiff any
Valuable consideration in exchange for the money and Promissory Notes Plaintiff
remitted in good faith. It seems unconscionable that a Bank or lender  would ask
Borrowers to put up money and pledge obligation to a debt as collateral for a
"Credit Loan" that the Bank or lender never contributed Value in the performance
of their claim to the security instruments which they claim a right to lien.

105.     Should a Court of law or equity allow a perpetrator of fraud to enforce a

claim with which they misrepresented the Value or failed to perform their

contribution of Value to have a lawful claim? Were the Court to do so, it would be

contrary to all principles of law.

106.     The argument that the Borrower received the property for the lender's

false representations gives the lender a claim or right for enforcement or relief is

not valid, unless the lender can prove that he gave lawful Value to the security.

The Bank or lender does not Loan its money, only the credit it receives from the

Borrower in the amount of the Promissory Note which is nothing more than an

accounting transaction on the Bank or lender's books. Hence, no *prima facie*

injury exists to the Bank or lenders upon the mere proof that they hold the

Mortgage and Promissory Note in their possession.

107.     "A perfect obligation is one recognized and sanctioned by positive law;

one of which the fulfillment can be enforced by the aid of law. But, if the duty

created by the obligation operates only on the moral sense, without being

enforced by an positive law, it is called an "imperfect obligation", and creates no

right of action, nor has it any legal operation. The duty of exercising gratitude,

charity, and the other merely moral duties are examples of this kind of

obligation." (*Edwards v. Keaney*, 96 U.S. 595, 600; 24 L. Ed. 793).

108.     When there is no consideration in jeopardy of being returned, then the

obligation is to make the Bank or lender injury proof, to the extent of the

obligation, which would be to make them whole. The only obligation is based

upon the moral issue, which under the law, is an Imperfect Obligation, to return to

them their property, which isn't wealth, but credit. A Promissory Note is signed under "economic compulsion" when, the "Loan" will not be consummated unless and until the Borrower signs it. Thus, performing the act of signing a Promissory Note cannot be considered voluntary.

109.     Plaintiff has reason to believe that the Promissory Note he signed was the currency the Defendant Original Lenders used to fund the Mortgage transaction at the inception of the "Liar's Loan" agreement. According to the Federal Reserve Bank's Book of Richmond, Virginia, title "Your Money" on page seven is states: "…demand deposit accounts are not legal tender…". If a Promissory Note is legal tender, the Bank must accept it to discharge the Mortgage Note. The Bank or lender changed the currency from the Promissory Note they deposited into a Bank Check (liability the Bank owes for the Mortgage Note they deposited).

110.     Plaintiff affirmatively alleges that the Defendant Original Lenders perpetrated fraud in the *factum* at the inception of the fraudulently induced Mortgage Loan by not providing Value to attach to Plaintiff's property because they did not provide funding for the purported "Liar's Loan" agreement Plaintiff was fraudulently induced into agreeing, and therefore have no right or claim to enforce in any Court of competent jurisdiction.

COUNT I –

18 § 1964(c) R.I.C.O. VIOLATIONS INVOLVING MORTGAGE FRAUD

111.     Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1 through 110 as though incorporated here to allege the fact that the Defendant(s), Original Lender 1 & 2 misrepresented the Appraisal Value of the

Plaintiff's subject property of this Complaint and have perpetrated the misrepresentation through an enterprise which is prohibited under 18 U.S.C. § 1964(c).

112.     Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1 through 111 as though incorporated here to allege the fact that the Defendant(s), Original Lender 1 & 2 transferred, assigned or sold Plaintiff's Mortgage and Note without Plaintiff's knowledge and consent to put Plaintiff at a usurious disadvantage to other Defendant(s), and each of them, who do not have a lawful right or claim to make against Plaintiff's Mortgage, Promissory Note and property.

COUNT II –

VIOLATIONS TO SECTION 1962(a) OF R.I.C.O.

113.     Plaintiff re-asserts the statements delineated in the foregoing paragraphs 1 through 111 as though incorporated here to allege the fact that the Defendant(s), and each of them, have engaged and benefitted from a corrupt enterprise to defraud homeowners over a period of more than twenty (20) years that has adversely impacted the Plaintiff and the American people as a whole for fraud in the sale of Mortgages, Promissory Notes and Securities.

114.     Plaintiff has suffered injury from the duplicitous inducement of the subject properties of this Complaint from the loss of equity and Loan-to-Value Ratio usury.

COUNT III –<br>
DECEIT ("DOLO") IN THE FULFILLMENT<br>
OF CONTRACTUAL OBLIGATIONS<br>
(Fraud in the Factum)

115.     Plaintiff re-asserts the statements delineated in the foregoing paragraphs

1 through 112 as though incorporated here to allege the fact that the

Defendant(s), Original Lender 1 & 2 failed to provide Value to attach to the

Plaintiff's Mortgage and Promissory Note at the inception of the Mortgage

transaction and therefore perpetrated fraud in the *factum* of the purported Loan

agreement.

116.     As a result of Defendant Original Lender 1 & 2's fraudulent acts Plaintiff

has suffered financial hardship, mental anguish and emotional distress trying to

maintain a debt he never owed.

**WHEREFORE** Plaintiff, Moses Nelson, demands judgment against the

Defendant(s), and each of them, for actual, consequential, compensatory, and potential

damages, together with the *vacatur* of final foreclosure judgments, discharge of *lis*

*pendens*, Satisfaction of Mortgage, cancellation of the Promissory Note; permanent

injunction against all Defendant(s), Successors, Assigns and Agents who try to enforce

a claim or judgment that has been fraudulently procured in violation of the 18 U.S.C. §

1964(c), (CGS) § 53-379a,  CGS § 36a-485 and U.C.C. § 9-203(b). Plaintiff also

demands to be compensated for  attorney's fees pursuant to the Mortgage Loan

documents based on reciprocity of contracts, that the Court uphold the Constitutions of

the united States of America, Connecticut State and provisions of law under Common

Law fraud, with strict scrutiny enforcement of provisions of law under CGS § 53-379a,

CGS § 36a-485 and 18 U.S.C. § 1964(c), including sanctions for raising unsupported

claims or defenses, and damages for delays in litigation; repair of any damage to

Plaintiff's credit history, interest, costs.

Plaintiff demands relief from the egregious fraudulent acts of the Defendant(s) and each of them in the treble damages amount of $750,000.00, and $250,000.00 for emotional distress and mental anguish for a total amount of $1,000,000.00 and such other and further relief as to the Court seems just and proper.

Further, Plaintiff demands trial by jury on all issues triable by jury, and reserves the right to amend this Complaint to include unknown parties or for perfecting of pleadings.

Date: December 17, 2018.
Connecticut State, Fairfield County.

Respectfully,

Moses Nelson
1584 North Avenue
Bridgeport, CT 06604
(203) 545-4902

# EXHIBIT 1

Return To:
American Brokers Conduit
520 Broadhollow Road
Melville, NY 11747

Prepared By:
Jason Robison
300 Bedford Street
Entrance D
Manchester, NH
03101

——————————— [Space Above This Line For Recording Data] ———————————

## OPEN-END MORTGAGE DEED

MIN 100024200014720532

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated   October 18, 2006
together with all Riders to this document.
(B) "Borrower" is   Moses Nelson

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this
Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DOC #:323031       APPL #:0001472053

CONNECTICUT -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

-6A(CT) (0005)    Form 3007 1/01
Page 1 of 14    Initials:
UM0: 9905.01
VMP MORTGAGE FORMS - (800)521-7291

(D) "Lender" is American Brokers Conduit

Lender is a Corporation
organized and existing under the laws of State of New York
Lender's address is 538 Broadhollow Road, Melville, NY 11747

(E) "Note" means the promissory note signed by Borrower and dated October 18, 2006
The Note states that Borrower owes Lender Three Hundred Ten Thousand and No/100
Dollars
(U.S. $ 310,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than November 1, 2036 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used in this
Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a
"federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan"
under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not
that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

DOC #:323032                         APPL #:0001472053

Initials: _____

─6A(CT) (0005)                        Page 2 of 14                        Form 3007 1/01

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County                                    of          Fairfield                                        :

      [Type of Recording Jurisdiction]                     [Name of Recording Jurisdiction]
SEE ATTACHED LEGAL DESCRIPTION

Parcel ID Number:  Map14 Blk1418 Lot5                          which currently has the address of
1584-1586 North Avenue                                                                [Street]
Bridgeport                                        [City] , Connecticut        06604 [Zip Code]
("Property Address"):

     TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
     1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

DOC  #:323033                    APPL #:0001472053

-6A(CT) (0005)                    Page 3 of 14                 Initials: _____               Form 3007  1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

DOC  #:323036                    APPL #:0001472053

Initials: _JU W_

-6A(CT) (0005)                   Page 6 of 14                    Form 3007  1/01

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees

to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

DOC  #:323038        APPL #:0001472053

Ⓥ-6A(CT) (0005)        Page 8 of 14        Initials: _____        Form 3007  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

DOC #:323039                    APPL #:0001472053

[logo]-6A(CT) (0005)              Page 9 of 14              Initials: _MN_              Form 3007  1/01

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

DOC #:323040                    APPL #:0001472053

-6A(CT) (0005)                    Page 10 of 14               Initials: _____            Form 3007 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC #:323042

APPL #:0001472053

Page 12 of 14

Initials: _U1 W_

Form 3007 1/01

-6A(CT) (0005)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

25. **Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____ (Seal)
CAROL MONTAS                                         Moses Nelson                       -Borrower

_____          _____ (Seal)
Gregory T. Lattanzi                                                                                   -Borrower

_____ (Seal)  _____ (Seal)
                                   -Borrower                                          -Borrower

_____ (Seal)  _____ (Seal)
                                   -Borrower                                          -Borrower

_____ (Seal)  _____ (Seal)
                                   -Borrower                                          -Borrower


STATE OF CONNECTICUT,     ~~Fairfield~~          New Haven   County ss:   New Haven

The foregoing instrument was acknowledged before me this October 18, 2006
by     Moses Nelson


My Commission Expires: N/A

_____
Notary Public   Gregory T. Lattanzi
                Comm. Sup. Ct.

DOC #:323044
6A(CT) (0005)                    APPL #:0001472053
                                Page 14 of 14                   Form 3007  1/01

07211   0220   STEWART TITLE GUARANTY COMPANY
COMMITMENT

## SCHEDULE A - DESCRIPTION

All that certain piece or parcel of land, with the buildings thereon standing, situated in the City of Bridgeport, County of Fairfield and State of Connecticut, being the greater portion of Lot No. 93 on Map of Building Lots of Fallon and Greenstien, made by Stoddard and McKenna, dated March 5, 1912 and on file in the Bridgeport Town Clerk's Office , bounded and described as follows:

North:  on Lot No. 60 on said map, 32.37 feet;

East:    on Lot No. 94 on said map, 132.48 feet;

South:   on North Avenue, 51.46 feet;

West:   on land of Mary E. Cotter, 139.18 feet, or more.

The West line of the above described tract meets North Avenue at a point 154.04 feet more or less East of the East line of Goodman Street as per said map.

FOR INFORMATION ONLY:

Commonly known as:       1584-1586 North Avenue
                         Bridgeport

Commitment No.:  33169

Page 2 of 4

0721l  0221

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this   18th      day of October, 2006        ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to  American Brokers Conduit

(the
"Lender") of the same date and covering the Property described in the Security Instrument and located at:
1584-1586 North Avenue, Bridgeport, CT  06604

[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to
the Property described in the Security Instrument, the following items now or hereafter attached to the
Property to the extent they are fixtures are added to the Property description, and shall also constitute the
Property covered by the Security Instrument: building materials, appliances and goods of every nature
whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property,
including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity,
gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus,
plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals,
washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods,
attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and
additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument.
All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if
the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument
as the "Property."

DOC  #:319831                     APPL #:0001472053
MULTISTATE 1- 4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Initials: _____        Form 3170 1/01

              UM31 0008              Page 1 of 4
(VMP)-57R (0008)              VMP MORTGAGE FORMS - (800)521-7291

07211   0222

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii)

DOC #:319832          APFL #:0001472053

07211   0223

Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

I. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

DOC #:319833          APPL #:0001472053

UMD-57R (0008)                    Page 3 of 4          Initials: _____
                                                      Form 3170 1/01

07211 0224

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
Moses Nelson                -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

_____ (Seal)
                            -Borrower

DOC #:319834                APPL #:0001472053            Form 3170 1/01
57R (0008)                  Page 4 of 4

BRIDGEPORT, CONN.
LAND RECORDS
REC'D FOR RECORD FILING
ON _10-20-06_ AT _2:22 PM_
ATTEST: _____
HECTOR DIAZ, TOWN CLERK

# EXHIBIT 2

004677    BK 6234 PG 126

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
MARTIN RRJOLLI

―――――――――――――― [Space Above This Line For Recording Data] ――――――――――――――

0008815710601005
[Doc ID #]

# OPEN-END MORTGAGE DEED

MIN 1000157-0004517433-7

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   JANUARY 28, 2005      , together with all Riders to this document.
(B) "Borrower" is
MOSES NELSON

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
COUNTRYWIDE HOME LOANS, INC.
Lender is a CORPORATION
organized and existing under the laws of NEW YORK                    . Lender's address is
4500 Park Granada, Calabasas, CA 91302-1613
(E) "Note" means the promissory note signed by Borrower and dated  JANUARY 28, 2005         . The Note states that Borrower owes Lender
TWO HUNDRED FIFTEEN THOUSAND THREE HUNDRED FIFTY and 00/100

Dollars (U.S. $ 215,350.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2035    .

CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 11                                              Initials: _____
-6A(CT) (0005)    CHL (08/00)(d)    VMP MORTGAGE FORMS - (800)521-7291          Form 3007  1/01
CONV/VA

* 2 3 9 9 1 *

* 0 8 8 1 5 7 1 0 6 0 0 0 0 0 2 0 0 6 A *


I hereby certify that this is a true copy of a document filed in the office of the Bridgeport Town Clerk and that the original document from which copy was made is recorded in Vol ____ Ps. ____ in the Bridgeport Land Records.
Dated: ____
ATTEST: ____
ALMA L. MAYA, TOWN CLERK

DOC ID #: 0008815710601005

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☒ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY of FAIRFIELD :

[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number:                                           which currently has the address of
                    757-759 IRANISTAN AVENUE, BRIDGEPORT
                                    [Street/City]
Connecticut      06605      ("Property Address"):
            [Zip Code]

Initials:

-6A(CT) (0005)      CHL (08/00)        Page 2 of 11                    Form 3007 1/01

DOC ID #: 0008815710601005

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

DOC ID #: 0008815710601005

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

RE234P6131

DOC ID #: 0008815710601005

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

DOC ID #: 0008815710601005

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

DOC ID #: 0008815710601005

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Initials:

DOC ID #: 0008815710601005

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires a connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any

DOC ID #: 0008815710601005

Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

**25. Future Advances.** Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ _____ (Seal)
MOSES NELSON -Borrower

_____ _____ (Seal)
Glika Hutchtounnidis -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

RK 6234 PG 136

**STATE OF CONNECTICUT,** Fairfic )

The foregoing instrument was acknowledged before me this

by

Moses Nelson

DOC ID #: 0008815710601005

County ss: Fairfield

2 8 2005

My Commission Expires:

_____
Notary Public

Sol E. Mahoney, Esq.
Commissioner of the Superior Court

# 1-4 FAMILY RIDER
### (Assignment of Rents)

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

Prepared By:
MARTIN RRJOLLI

                                     0008815710601005
                                          [Doc ID #]

    THIS 1-4 FAMILY RIDER is made this TWENTY-EIGHTH   day of JANUARY, 2005  ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure
Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
757-759 IRANISTAN AVENUE
BRIDGEPORT, CT 06605
[Property Address]

    **1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**MULTISTATE 1-4 FAMILY RIDER - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

VMP-57R (0401).01    CHL (06/04)(d)     Page 1 of 3          Initials: ___
             VMP Mortgage Solutions, Inc. (800)521-7291      Form 3170 1/01





*23991*

*08815710600000 2057R*

DOC ID #: 0008815710601005

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until: (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument, and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and

Initials: _____
Form 3170 1/01

DOC ID #: 0008815710601005

maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____ (Seal)
MOSES NELSON                                    - Borrower

_____ (Seal)
                                                 - Borrower

_____ (Seal)
                                                 - Borrower

_____ (Seal)
                                                 - Borrower

-57R (0401).01 CHL (06/04)          Page 3 of 3               Form 3170 1/01

ORDER NO. CTSTA138701R

## SCHEDULE A
### DESCRIPTION

All that certain piece or parcel of land, together with all the
buildings and improvements thereon standing, situated in the City of
Bridgeport, County of Fairfield and State of Connecticut, and bounded
and described as follows:

Known and designated as Lot No. 3 as shown on Map Number 6, filed by
The Bridgeport Land and Title Company, certified substantially correct
by Scofield and Ford, Surveyors, dated November 16, 1901, and filed
for record in the Bridgeport Town Clerk's Office, said premises being
more particularly bounded and described as follows:

NORTHERLY:   On Land now or formerly of Michael and Anna Kervin, being
             Lot No. 2, as shown on said map, 80 feet;

EASTERLY:    On Iranistan Avenue, 31.35 feet;

SOUTHERLY:   On land now or formerly of Catherine A. Holden, 80 feet;

WESTERLY:    On Land now or formerly of Sabina Abt, being Lot No. 4,
             as shown on said map, 31.35 feet.

Said premises are also know as 757-759 Iranistan Avenue.

BRIDGEPORT, CONN.
LAND RECORDS
REC'D FOR RECORD FILING
ON 3|1|05 AT 1:10PM
ATTEST: _____
HECTOR DIAZ, TOWN CLERK

EXHIBIT 3



*2004010132381*

**GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED**                    **AS OF 12/04/2018**

```
BILL NO:        2004-01-0132381      ORIGINAL OWNER:   MOSS NELSON
UNIQUE ID:      1418--05------       C/O:
LINK#                                ADDRESS:          1584 NORTH AVE
FILE#                                ADDRESS2:
BANK:           FIR1                 CITY ST ZIP:      BRIDGEPORT CT 06604
ESCROW:                              COUNTRY:
VOL/PAGE:                            PROP LOC.:        1584 NORTH AVE
LIEN VOL/PAGE:                       EXR PROP LOC:     1586
DISTRICT:                            M/B/L:            1418--05------

PLAN CODE:      RE                   DESCRIPTION:
PROP ASSESSED:       149,310         ELD CODE:         0
EXEMPTIONS:                          EXMPT CHANGE:
COC CHANGE:
NET VALUE:      149,310
MILL RATE:      40.3200
```

**\*\*\* BILLED \*\*\***

|          | CITY     | DSSD   | TOTALS   |
|----------|----------|--------|----------|
| INST1:   | 3,010.09 | 0.00   | 3,010.09 |
| INST2:   | 3,010.09 | 0.00   | 3,010.09 |
| INST3:   | 0.00     | 0.00   | 0.00     |
| INST4:   | 0.00     | 0.00   | 0.00     |
| ADJS:    | 0.00     | 0.00   | 0.00     |
| TOT TAX: | 6,020.18 | 0.00   | 6,020.18 |
| TOTAL PAID: | 6,020.18 | 0.00 | 6,020.18 |

**\*\*\* PAYMENTS \*\*\***

| TYPE | CYCLE | DATE       | ADJ | TERM/BATCH/SEQ | INST | AMOUNT   | INTEREST | LIENS | FEES | TOTALS   |
|------|-------|------------|-----|----------------|------|----------|----------|-------|------|----------|
| Pmt  | 7     | 01/27/2006 |     | 59/3799137/1   | T    | 3,010.09 | 0.00     | 0.00  | 0.00 | 3,010.09 |
| Pmt  | 2     | 08/10/2005 |     | 59/3721064/1   | T    | 3,010.09 | 0.00     | 0.00  | 0.00 | 3,010.09 |
|      |       | TOTAL PAYMENTS: |  |                |      | 6,020.18 | 0.00     | 0.00  | 0.00 | 6,020.18 |

**TOTAL BALANCE DUE AS OF 12/04/2018**

|              | CITY | DSSD | TOTAL |
|--------------|------|------|-------|
| INT DUE:     | 0.00 | 0.00 | 0.00  |
| LIEN DUE:    | 0.00 | 0.00 | 0.00  |
| FEES DUE:    | 0.00 | 0.00 | 0.00  |
| TAX DUE NOW: | 0.00 | 0.00 | 0.00  |
| TOT DUE NOW: | 0.00 | 0.00 | 0.00  |
| BALANCE DUE: | 0.00 | 0.00 | 0.00  |

**\*\*\* FLAGS \*\*\***
```
Circuit Breaker Amount: 0            Benefit Year:        0
Invalid Address Flag    No
```



*2005010132381*

**GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED**          **AS OF 12/04/2018**

```
BILL NO:       2005-01-0132381        ORIGINAL OWNER:   MOSS NELSON
UNIQUE ID:     1418--05-------        C/O:
LINK#                                 ADDRESS:          1584 NORTH AVE
FILE#                                 ADDRESS2:
BANK:          ZCST                   CITY ST ZIP:      BRIDGEPORT CT 06604
ESCROW:                               COUNTRY:
VOL/PAGE:                             PROP LOC.:        1584 NORTH AVE
LIEN VOL/PAGE:                        EXR PROP LOC:     1586
DISTRICT:                             M/B/L:            1418--05-------

PLAN CODE:     RE                     DESCRIPTION:
PROP ASSESSED:      149,310           ELD CODE:             0
EXEMPTIONS:                           EXMPT CHANGE:
COC CHANGE:
NET VALUE:          149,310
MILL RATE:     42.2800
```

**\*\*\* BILLED \*\*\***

|          | CITY     | DSSD  | TOTALS   |
|----------|----------|-------|----------|
| INST1:   | 3,156.42 | 0.00  | 3,156.42 |
| INST2:   | 3,156.42 | 0.00  | 3,156.42 |
| INST3:   | 0.00     | 0.00  | 0.00     |
| INST4:   | 0.00     | 0.00  | 0.00     |
| ADJS:    | 0.00     | 0.00  | 0.00     |
| TOT TAX: | 6,312.84 | 0.00  | 6,312.84 |
| TOTAL PAID: | 6,312.84 | 0.00 | 6,312.84 |

**\*\*\* PAYMENTS \*\*\***

| TYPE | CYCLE | DATE | ADJ | TERM/BATCH/SEQ | INST | AMOUNT | INTEREST | LIENS | FEES | TOTALS |
|------|-------|------|-----|----------------|------|--------|----------|-------|------|--------|
| Pmt  | 6     | 12/27/2006 |  | 0/3965405/1 | T | 3,156.42 | 0.00 | 0.00 | 0.00 | 3,156.42 |
| Pmt  | 1     | 07/31/2006 |  | 59/3902808/1 | T | 3,156.42 | 0.00 | 0.00 | 0.00 | 3,156.42 |
|      |       | TOTAL PAYMENTS: |  |  |  | 6,312.84 | 0.00 | 0.00 | 0.00 | 6,312.84 |

**TOTAL BALANCE DUE AS OF 12/04/2018**

|              | CITY  | DSSD  | TOTAL |
|--------------|-------|-------|-------|
| INT DUE:     | 0.00  | 0.00  | 0.00  |
| LIEN DUE:    | 0.00  | 0.00  | 0.00  |
| FEES DUE:    | 0.00  | 0.00  | 0.00  |
| TAX DUE NOW: | 0.00  | 0.00  | 0.00  |
| TOT DUE NOW: | 0.00  | 0.00  | 0.00  |
| BALANCE DUE: | 0.00  | 0.00  | 0.00  |

**\*\*\* FLAGS \*\*\***

```
Circuit Breaker Amount: 0              Benefit Year:         0
Invalid Address Flag    No
```



*2006010132381*

## GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED

# AS OF 12/04/2018

```
BILL NO:         2006-01-0132381        ORIGINAL OWNER:   MOSS NELSON
UNIQUE ID:       1418--05-------        C/O:
LINK#                                   ADDRESS:          1584 NORTH AVE
FILE#                                   ADDRESS2:
BANK:            WELL                   CITY ST ZIP:      BRIDGEPORT CT 06604
ESCROW:                                 COUNTRY:
VOL/PAGE:                               PROP LOC.:        1584 NORTH AVE
LIEN VOL/PAGE:                          EXR PROP LOC:     1586
DISTRICT:                               M/B/L:            1418--05-------

PLAN CODE:       RE                     DESCRIPTION:
PROP ASSESSED:      149,310             ELD CODE:             0
EXEMPTIONS:                             EXMPT CHANGE:
COC CHANGE:
NET VALUE:          149,310
MILL RATE:       41.2800
```

### *** BILLED ***

|        | CITY     | DSSD | TOTALS   |
|--------|----------|------|----------|
| INST1: | 3,081.76 | 0.00 | 3,081.76 |
| INST2: | 3,081.76 | 0.00 | 3,081.76 |
| INST3: | 0.00     | 0.00 | 0.00     |
| INST4: | 0.00     | 0.00 | 0.00     |
| ADJS:  | 0.00     | 0.00 | 0.00     |
| TOT TAX: | 6,163.52 | 0.00 | 6,163.52 |
| TOTAL PAID: | 6,163.52 | 0.00 | 6,163.52 |

### *** PAYMENTS ***

| TYPE | CYCLE | DATE | ADJ | TERM/BATCH/SEQ | INST | AMOUNT | INTEREST | LIENS | FEES | TOTALS |
|------|-------|------|-----|----------------|------|--------|----------|-------|------|--------|
| Pmt  | 7     | 01/25/2008 | | 59/4177800/1 | T | 3,071.76 | 0.00 | 0.00 | 0.00 | 3,071.76 |
| Pmt  | 2     | 08/09/2007 | | 23/4102892/1 | T | 3,091.76 | 0.00 | 0.00 | 0.00 | 3,091.76 |
|      |       | TOTAL PAYMENTS: | | | | 6,163.52 | 0.00 | 0.00 | 0.00 | 6,163.52 |

### TOTAL BALANCE DUE AS OF 12/04/2018

|              | CITY | DSSD | TOTAL |
|--------------|------|------|-------|
| INT DUE:     | 0.00 | 0.00 | 0.00  |
| LIEN DUE:    | 0.00 | 0.00 | 0.00  |
| FEES DUE:    | 0.00 | 0.00 | 0.00  |
| TAX DUE NOW: | 0.00 | 0.00 | 0.00  |
| TOT DUE NOW: | 0.00 | 0.00 | 0.00  |
| BALANCE DUE: | 0.00 | 0.00 | 0.00  |

### *** FLAGS ***

```
Circuit Breaker Amount: 0           Benefit Year:        0
Invalid Address Flag    No
```

# EXHIBIT 4


*2005010099082*

**GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED**                     **AS OF 12/04/2018**

```
BILL NO:        2005-01-0099082    ORIGINAL OWNER:   NELSON MOSES
UNIQUE ID:      1158--31-------    C/O:
LINK#                              ADDRESS:          757 IRANISTAN AVE
FILE#                              ADDRESS2:
BANK:           CTYW               CITY ST ZIP:      BRIDGEPORT CT 06605
ESCROW:                            COUNTRY:
VOL/PAGE:                          PROP LOC.:        757 IRANISTAN AVE
LIEN VOL/PAGE:                     EXR PROP LOC:     759
DISTRICT:                          M/B/L:            1158--31-------


PLAN CODE:      RE                 DESCRIPTION:
PROP ASSESSED:     108,010         ELD CODE:             0
EXEMPTIONS:                        EXMPT CHANGE:
COC CHANGE:
NET VALUE:         108,010
MILL RATE:      42.2800
```

**\*\*\* BILLED \*\*\***

|        | CITY     | DSSD | TOTALS   |
|--------|----------|------|----------|
| INST1: | 2,283.33 | 0.00 | 2,283.33 |
| INST2: | 2,283.33 | 0.00 | 2,283.33 |
| INST3: | 0.00     | 0.00 | 0.00     |
| INST4: | 0.00     | 0.00 | 0.00     |
| ADJS:  | 0.00     | 0.00 | 0.00     |
| TOT TAX: | 4,566.66 | 0.00 | 4,566.66 |
| TOTAL PAID: | 4,566.66 | 0.00 | 4,566.66 |

**\*\*\* PAYMENTS \*\*\***

| TYPE | CYCLE | DATE | ADJ | TERM/BATCH/SEQ | INST | AMOUNT | INTEREST | LIENS | FEES | TOTALS |
|------|-------|------|-----|----------------|------|--------|----------|-------|------|--------|
| Pmt | 7 | 01/29/2007 | | 59/3995484/1 | T | 2,283.33 | 0.00 | 0.00 | 0.00 | 2,283.33 |
| Pmt | 2 | 08/07/2006 | | 59/3914051/1 | T | 2,283.33 | 0.00 | 0.00 | 0.00 | 2,283.33 |
| | | TOTAL PAYMENTS: | | | | 4,566.66 | 0.00 | 0.00 | 0.00 | 4,566.66 |

**TOTAL BALANCE DUE AS OF 12/04/2018**

|              | CITY | DSSD | TOTAL |
|--------------|------|------|-------|
| INT DUE:     | 0.00 | 0.00 | 0.00  |
| LIEN DUE:    | 0.00 | 0.00 | 0.00  |
| FEES DUE:    | 0.00 | 0.00 | 0.00  |
| TAX DUE NOW: | 0.00 | 0.00 | 0.00  |
| TOT DUE NOW: | 0.00 | 0.00 | 0.00  |
| BALANCE DUE: | 0.00 | 0.00 | 0.00  |

**\*\*\* FLAGS \*\*\***
```
Circuit Breaker Amount: 0          Benefit Year:         0
Invalid Address Flag    No
```


*2006010099082*

### GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED

**AS OF 12/04/2018**

```
BILL NO:        2006-01-0099082      ORIGINAL OWNER:   NELSON MOSES
UNIQUE ID:      1158--31-------      C/O:
LINK#                                ADDRESS:          757 IRANISTAN AVE
FILE#                                ADDRESS2:
BANK:           CTYW                 CITY ST ZIP:      BRIDGEPORT CT 06605
ESCROW:                              COUNTRY:
VOL/PAGE:                            PROP LOC.:        757 IRANISTAN AVE
LIEN VOL/PAGE:                       EXR PROP LOC:     759
DISTRICT:                            M/B/L:            1158--31-------

PLAN CODE:      RE                   DESCRIPTION:
PROP ASSESSED:    108,010            ELD CODE:         0
EXEMPTIONS:                          EXMPT CHANGE:
COC CHANGE:
NET VALUE:        108,010
MILL RATE:     41.2800
```

**\*\*\* BILLED \*\*\***

|          | CITY     | DSSD | TOTALS   |
|----------|----------|------|----------|
| INST1:   | 2,229.33 | 0.00 | 2,229.33 |
| INST2:   | 2,229.33 | 0.00 | 2,229.33 |
| INST3:   | 0.00     | 0.00 | 0.00     |
| INST4:   | 0.00     | 0.00 | 0.00     |
| ADJS:    | 0.00     | 0.00 | 0.00     |
| TOT TAX: | 4,458.66 | 0.00 | 4,458.66 |
| TOTAL PAID: | 4,458.66 | 0.00 | 4,458.66 |

**\*\*\* PAYMENTS \*\*\***

| TYPE | CYCLE | DATE | ADJ | TERM/BATCH/SEQ | INST | AMOUNT | INTEREST | LIENS | FEES | TOTALS |
|------|-------|------|-----|----------------|------|--------|----------|-------|------|--------|
| Pmt | 8 | 02/06/2008 | | 59/4202772/1 | T | 2,229.33 | 0.00 | 0.00 | 0.00 | 2,229.33 |
| Pmt | 2 | 08/13/2007 | | 59/4119694/1 | T | 2,229.33 | 0.00 | 0.00 | 0.00 | 2,229.33 |
| | | TOTAL PAYMENTS: | | | | 4,458.66 | 0.00 | 0.00 | 0.00 | 4,458.66 |

**TOTAL BALANCE DUE AS OF 12/04/2018**

|              | CITY | DSSD | TOTAL |
|--------------|------|------|-------|
| INT DUE:     | 0.00 | 0.00 | 0.00  |
| LIEN DUE:    | 0.00 | 0.00 | 0.00  |
| FEES DUE:    | 0.00 | 0.00 | 0.00  |
| TAX DUE NOW: | 0.00 | 0.00 | 0.00  |
| TOT DUE NOW: | 0.00 | 0.00 | 0.00  |
| BALANCE DUE: | 0.00 | 0.00 | 0.00  |

**\*\*\* FLAGS \*\*\***

```
Circuit Breaker Amount: 0          Benefit Year:        0
Invalid Address Flag    No
```


*2004010099082*

## GENERAL DATA REAL ESTATE CITY OF BRIDGEPORT - ARCHIVED

**AS OF 12/04/2018**

```
BILL NO:        2004-01-0099082        ORIGINAL OWNER:    NELSON MOSES
UNIQUE ID:      1158--31-------        C/O:
LINK#                                  ADDRESS:           757 IRANISTAN AVE
FILE#                                  ADDRESS2:
BANK:           CTYW                   CITY ST ZIP:       BRIDGEPORT CT 06605
ESCROW:                                COUNTRY:
VOL/PAGE:                              PROP LOC.:         757 IRANISTAN AVE
LIEN VOL/PAGE:                         EXR PROP LOC:      759
DISTRICT:                              M/B/L:             1158--31-------

PLAN CODE:      RE                     DESCRIPTION:
PROP ASSESSED:     108,010             ELD CODE:          0
EXEMPTIONS:                            EXMPT CHANGE:
COC CHANGE:
NET VALUE:         108,010
MILL RATE:      40.3200
```

### *** BILLED ***

|        | CITY     | DSSD  | TOTALS   |
|--------|----------|-------|----------|
| INST1: | 2,177.48 | 0.00  | 2,177.48 |
| INST2: | 2,177.48 | 0.00  | 2,177.48 |
| INST3: | 0.00     | 0.00  | 0.00     |
| INST4: | 0.00     | 0.00  | 0.00     |
| ADJS:  | 0.00     | 0.00  | 0.00     |
| TOT TAX: | 4,354.96 | 0.00 | 4,354.96 |
| TOTAL PAID: | 4,354.96 | 0.00 | 4,354.96 |

### *** PAYMENTS ***

| TYPE | CYCLE | DATE       | ADJ | TERM/BATCH/SEQ | INST | AMOUNT   | INTEREST | LIENS | FEES | TOTALS   |
|------|-------|------------|-----|----------------|------|----------|----------|-------|------|----------|
| Pmt  | 7     | 01/18/2006 |     | 59/3779045/1   | T    | 2,177.48 | 0.00     | 0.00  | 0.00 | 2,177.48 |
| Pmt  | 1     | 07/27/2005 |     | 59/3684625/1   | T    | 2,177.48 | 0.00     | 0.00  | 0.00 | 2,177.48 |
|      |       | TOTAL PAYMENTS: |  |                |      | 4,354.96 | 0.00     | 0.00  | 0.00 | 4,354.96 |

### TOTAL BALANCE DUE AS OF 12/04/2018

|             | CITY | DSSD | TOTAL |
|-------------|------|------|-------|
| INT DUE:    | 0.00 | 0.00 | 0.00  |
| LIEN DUE:   | 0.00 | 0.00 | 0.00  |
| FEES DUE:   | 0.00 | 0.00 | 0.00  |
| TAX DUE NOW: | 0.00 | 0.00 | 0.00 |
| TOT DUE NOW: | 0.00 | 0.00 | 0.00 |
| BALANCE DUE: | 0.00 | 0.00 | 0.00 |

### *** FLAGS ***

```
Circuit Breaker Amount: 0
Invalid Address Flag    No          Benefit Year:       0
```

## VERIFICATION

CONNECTICUT STATE                              }
                                               }ss:
FAIRFIELD COUNTY                               }

I, Moses Nelson, hereby verify that I have personal firsthand knowledge of the

foregoing statements made by me in the Civil R.I.C.O. Complaint. I affirm that those

statements are true and correct to the best of my knowledge and belief and are

being submitted to this Court under penalty of perjury per 28 U.S.C. § 1746.

Date: December 17, 2018.

Respectfully,

Moses Nelson

Affirmed and Ascribed Before Me This
____ day of December, 2018.

Notary

Paul J. Liguori
Notary Public-Connecticut
My Commission Expires
March 31, 2023